23CA1879 Marriage of Battles 11-14-2024 modified

COLORADO COURT OF APPEALS

---

Court of Appeals No. 23CA1879
Arapahoe County District Court No. 21DR31702
Honorable Cajardo Lindsey, Judge

---

In re the Marriage of

Meghann Mary Ward Battles, n/k/a Meghann Mary Ward McPherson,

Appellee,

and

Cort Owen Battles,

Appellant.

---

JUDGMENT AFFIRMED IN PART, REVERSED IN PART,
AND CASE REMANDED WITH DIRECTIONS

Division V
Opinion by JUDGE LUM
Freyre and Grove, JJ., concur

Opinion Modified On the Court's Own Motion
and Petition for Rehearing <u>DENIED</u>

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced November 14, 2024

---

Meghann Mary Ward McPherson, Pro Se

Caroline C. Cooley, Christopher J. Linas, Castle Rock, Colorado, for Appellant

OPINION is modified as follows:

**Page 17, ¶ ¶ 40-41 currently reads:**

Father asserts that the trial court improperly delegated parenting time decisions to C.B. when it ordered that C.B. could not be required to attend joint reintegration therapy sessions with him.

A court may not delegate parenting time decisions to any third party, including the child. *See In Interest of D.R.V-A.*, 976 P.2d 881, 884 (Colo. App. 1999). However, while the court gave C.B. autonomy over his participation in reintegration therapy, the reintegration therapy isn't parenting time under these circumstances. Indeed, the court expressly said that father had no parenting time. Therefore, there is no parenting time to delegate, and we perceive no error.

**Opinion now reads:**

Father asserts that the trial court improperly delegated parenting time decisions to C.B. when it ordered that C.B. could not be required to attend joint reintegration therapy sessions with him. We disagree.

We agree with father that a court may not delegate its authority to decide whether parenting time should occur to any

third party, including the child.  *See In Interest of D.R.V-A.*, 976 P.2d 881, 884 (Colo. App. 1999).  However, to the extent father relies on *D.R.V-A.* to suggest that reintegration therapy is always "parenting time" for purposes of domestic relations proceedings and, therefore, that a court may not grant a child autonomy over whether to participate in reintegration therapy, we disagree.

Father relies on the following language in *D.R.V-A.*: The "order, which effectively defers to the family therapist the trial court's decisions as to when mother should be allowed to participate in family therapy or exercise unsupervised parenting time, constitutes an improper delegation of the court's authority."  *Id.* at 885.  While at first glance this language appears to support father's contention, the surrounding context reveals otherwise.

In *D.R.V-A.*, mother had supervised parenting time "until such time as the guardian [ad litem] and family therapist agreed that unsupervised visits should resume."  *Id.* at 883.  Mother's ability to obtain the family therapist's agreement to resume unsupervised parenting time was "affected by the lack of . . . family therapy."  *Id.* The court ordered father to have the children participate in family therapy but also ordered that mother could only be involved in the

therapy to the extent the therapist believed it appropriate. *Id.* Finally, the court ordered that it would reconsider the issue of unsupervised parenting time only when the family therapist filed a recommendation for the same. *Id.*

On appeal, mother contended that "the trial court erred in structuring the order in such a way that her *ability to exercise unsupervised parenting time* is dependent upon the family therapist filing such a recommendation with the court." *Id.* at 884 (emphasis added). A division of this court agreed, holding that the order

> constituted an improper delegation of authority because it precluded mother from obtaining an evidentiary hearing until such time as the family therapist recommended unsupervised [parenting time]. When and if that point was reached, presumably an evidentiary hearing would be unnecessary. Thus, we conclude that the decision to condition the exercise of parenting time on the assent of the family therapist was improper, as was the court's conditioning the setting of an evidentiary hearing on such assent.

*Id.*

Without further analysis about why the order was improper, the division then used the language on which father relies as the

concluding paragraph in the relevant section of the opinion. *Id.* at 885.

Viewed in context, particularly given the way mother framed the issue on appeal, it's clear that the issue in *D.R.V-A.* was not mother's participation in family therapy per se. It was that mother's ability to exercise unsupervised parenting time — or even to obtain a hearing on that topic — was expressly conditioned on the therapist's recommendation. And in turn, that recommendation was affected by the therapist's authority to determine whether mother participated in family therapy.

We therefore don't perceive *D.R.V-A.* as holding that reintegration therapy is *always* "parenting time" such that a child can *never* be given autonomy over whether to participate in it. In this case, it's clear that the reintegration therapy is not parenting time. Indeed, the court expressly stated that it "cannot, in good conscience, order *any* parenting time between Father and [C.B.]" because parenting time with father was not in C.B.'s best interests. (Emphasis added.) And — unlike in *D.R.V-A.* — father's ability to exercise parenting time in the future is not expressly conditioned on the therapist's recommendation. Therefore, we do not perceive that

the court improperly delegated any decision about whether parenting time between C.B. and father may take place.

**Added footnote 3 on Page 20 reads:**

[3] To the extent *In Interest of D.R.V-A.*, 976 P.2d 881 (Colo. App. 1999), does hold that reintegration therapy is always, as a matter of law, "parenting time" in domestic relations proceedings, we disagree. *See Chavez v. Chavez*, 2020 COA 70, ¶ 13 ("[D]ivisions are not bound by the decisions of other divisions . . . ."). While reintegration therapy may be considered "parenting time" in some circumstances, the court's order makes clear that it isn't parenting time under the circumstances of this case.

**Footnote 3 on Page 22 currently reads:**

[3] Father repeatedly asserts that he grabbed C.B. by the back of the neck rather than the front of the neck. This distinction doesn't affect our view of the court's child abuse finding in this case.

**Opinion now reads (as footnote 4):**

[4] Father repeatedly asserts that the record supports, at most, that he grabbed C.B. by the back of the neck rather than the front of the neck. This distinction doesn't affect our view of the court's child abuse finding in this case.

¶ 1    In this dissolution of marriage proceeding, Cort Owen Battles (father) appeals the portion of the permanent orders that allocate parental responsibilities for the two minor children to Meghann Mary Ward McPherson, f/k/a Meghann Mary Ward Battles (mother).  Father also appeals the trial court's denial of his motion for a new trial.

¶ 2    We affirm in part, reverse in part, and remand for further proceedings.

## I.    Background

¶ 3    Mother and father are the parents of two minor children, C.B. and F.B., who were thirteen and eleven (respectively) at the time of permanent orders.  Because of allegations that father had verbally (and sometimes physically) abused the children, the children's therapist made a report to the Department of Human Services.  Early in the case, the court ordered that father's parenting time be supervised by a reintegration therapist.  The court also appointed Dr. Edward Budd as the parental responsibilities evaluator (PRE).

¶ 4    During the pendency of the case, both children participated in individual therapy, along with sessions with the reintegration therapist.  F.B. participated in some sessions with the reintegration

1

therapist and father, while C.B. refused to have contact with father. After the permanent orders hearing, the court ordered that father would not have any parenting time with either child, and mother would have sole decision-making responsibility.

¶ 5    Father filed a C.R.C.P. 59 motion based on newly discovered evidence; namely, a status report from the reintegration therapist. The court denied father's motion.

¶ 6    Father now appeals.  He contends the trial court erred by restricting his parenting time, allocating sole decision-making authority to mother, and denying the motion for a new trial.

## II.    Parenting Time

¶ 7    Father contends that the trial court erred by (1) restricting his parenting time without applying the endangerment standard; (2) restricting his parenting time without considering less detrimental alternatives; (3) improperly delegating parenting time decisions to the children; and (4) failing to consider his constitutional rights.

### A.    Applicable Law and Standard of Review

¶ 8    In all cases, the trial court must determine the allocation of parenting time according to the child's best interests, "giving paramount consideration to the child's safety and the physical,

2

mental, and emotional conditions and needs of the child." § 14-10-124(1.5), C.R.S. 2024. In making the best interests determination, the court must consider the factors set forth in section 14-10-124(1.5)(a)(I)-(XI). *In re Marriage of Finer*, 920 P.2d 325, 327 (Colo. App. 1996).

¶ 9 However, for a court to "impos[e] . . . a parenting time restriction," the court must also find "that parenting time by the [restricted] party would endanger the child's physical health or significantly impair the child's emotional development" and "enumerate the specific factual findings supporting the restriction," including findings related to child abuse. § 14-10-124(1.5)(a). "[W]hat constitutes endangerment to a particular child's physical or emotional health is a highly individualized determination . . . ." *In re Marriage of Parr*, 240 P.3d 509, 512 (Colo. App. 2010).

¶ 10 The determination of parenting time falls within the broad discretion of the trial court, and we will exercise every presumption that supports upholding the court's decision. *In re Marriage of Hatton*, 160 P.3d 326, 330 (Colo. App. 2007). A court abuses its discretion if its decision is manifestly arbitrary, unreasonable, or

unfair, or if it misapplies the law. *In re Marriage of Badawiyeh*, 2023 COA 4, ¶ 9.

¶ 11    "It is the responsibility of the trial court as the trier of fact to determine the credibility of the witnesses and the sufficiency, probative effect, and weight of the evidence." *Hatton*, 160 P.3d at 330. We review de novo, however, whether the court applied the correct legal standards in determining parenting time. *In re Parental Responsibilities Concerning B.R.D.*, 2012 COA 63, ¶ 15.

### B.    Additional Facts

¶ 12    During the permanent orders hearing, the court heard testimony from mother; father; Dr. Budd; and Dr. Shelley Bresnick, the children's reintegration therapist. By agreement, the court also considered the deposition testimony of Dr. Andrew Loizeaux, an expert retained by father to review Dr. Budd's work. The court found all the professional witnesses credible and concluded that Dr. Budd was more credible than Dr. Loizeaux.

¶ 13    Regarding the children's progress in reintegration therapy during the pendency of the case, the court found that

- C.B. had adamantly refused any contact with father, including in a therapeutic setting;

- F.B. and father had attended reintegration therapy together and "interact in a positive and affectionate manner";

- during F.B.'s sessions with father, "[b]oth appear very happy to see one another"; and

- regarding F.B., father had taken Dr. Bresnick's feedback well and "demonstrated insight into his behaviors."

¶ 14   Mother requested that father have no parenting time with C.B. Father proposed that C.B. continue to work with his individual therapist and with the reintegration therapist on an individual basis. After three months, father proposed that he and C.B. have joint reunification sessions every other week. Father also urged the court to set periodic status conferences regarding C.B.'s parenting time.

¶ 15   Mother proposed that father and F.B. continue having joint reintegration therapy sessions and that the parties could reassess moving beyond reintegration therapy when and if Dr. Bresnick and F.B.'s therapist believed F.B. was ready. Father proposed a step-up plan in which he would receive supervised visits after a month of reintegration therapy, followed by unsupervised visits, which would gradually increase until the parties had equal parenting time.

¶ 16    In considering the children's best interest, the court made the following additional relevant findings[1]:

- On one occasion, father forcibly stuffed candy wrappers in C.B.'s mouth while holding him against the wall by his neck.

- The children described "verbal derogation by [father] on a more or less daily basis."

- Father "verbally belittled and physically intimidated the [children], on a frequent basis, over a period of years . . . . [Father's] behavior produced father-child relationships so troubling for the [children] that whether the damage can be repaired is unclear."

- Father had "grabb[ed] [the children] by the necks and arms and call[ed] them cocksuckers, pussies, bitches, fuck holes, ass holes, retarded fucks, and pieces of shit."

- Father committed child abuse.

---

[1] Some of the court's findings were adopted from Dr. Budd's PRE report, Dr. Bresnick's status reports, or from statements made by the parties.

- C.B. had been taken to the emergency room on two previous occasions with suicidal ideation.

- C.B. told Dr. Budd that he did not want to see father "ever again under any circumstances."

- F.B. told Dr. Budd that he wanted to see father "every two weeks and only in the presence of a supervisor."

- Both children would strongly prefer to live with mother.

- "Each party has psychological limitations that helped cause and perpetuate problems in the family. Each externalizes responsibility."

- "Neither party is especially supportive of the other's relationship with the children."

- Both parents can place the children's needs ahead of their own, though each parent had "blind spots."

¶ 17    Father did not testify about any of the incidents of verbal degradation of the children or the incident with the candy wrappers. However, he confirmed the candy wrapper incident to Dr. Budd. The court also took judicial notice of apology letters father wrote to the children in which father acknowledged that he "bullied" the children and that his words were "hurtful and abusive."

¶ 18    Ultimately, the court ordered that C.B. continue therapy with his individual therapist and with Dr. Bresnick. However, the court ordered that C.B. could not be required to participate in reintegration therapy with his father if he displayed resistance to doing so. The court further ordered that, based on the professionals' opinions and the abuse and trauma C.B. suffered, parenting time between father and C.B. would not be in C.B.'s best interests.

¶ 19    The court made nearly identical orders regarding F.B. The court noted that it seemed F.B. was ready to participate in reintegration therapy, but nevertheless, F.B. could not be forced into therapy if he displayed resistance.

### C.    Analysis

#### 1.    Endangerment Standard

¶ 20    Father contends that the trial court failed to apply the endangerment standard when restricting his parenting time with the children. Father also asserts that the court's findings that father abused the children concerned only past acts of child abuse, and the court failed to consider whether parenting time with father would *presently* endanger the children or significantly impair their

emotional development. We disagree as to C.B. but conclude that more findings are necessary as to F.B.

### a. C.B.

¶ 21 We recognize that the court did not specifically find that parenting time with father "would endanger [C.B.]'s physical health or significantly impair [C.B.]'s emotional development." § 14-10-124(1.5)(a). We also recognize that, as father argues, father's past acts of child abuse do not automatically mean that parenting time with him would presently endanger C.B. *See In re Marriage of Bertsch*, 97 P.3d 219, 222 (Colo. App. 2004).

¶ 22 Nevertheless, we can infer from the trial court's findings and order that it considered and applied the endangerment standard and concluded that contact with father would significantly impair C.B.'s emotional development or endanger his physical health. *See In re Marriage of Garst*, 955 P.2d 1056, 1059 (Colo. App. 1998) (noting that, while the court could have made more specific findings, the findings made and reference to the parenting evaluation "demonstrate that the trial court considered" the appropriate best interests factors).

¶ 23    The court began by citing the correct statutory standard for endangerment, along with the statutory best interests factors.  To the extent father contends that the court's slight paraphrasing of the statutory language indicates that the court didn't understand or apply the correct law, we disagree.

¶ 24    In allocating parenting time, the court said that it "cannot, in good conscience, order any parenting time between Father and [C.B.]"  The court based its decision on "the credible opinions of Dr. Budd and Dr. Loizeaux" and "evidence of [C.B.]'s abuse and trauma."

¶ 25    Immediately before making this order, the court referenced Dr. Budd's testimony that forcing C.B. to see father was a "bad idea" because a child who is forced into reintegration therapy often goes "nuts."  The court also discussed Dr. Budd's testimony that a child in that situation may become estranged from *both* parents because the child perceives that the parent who forced them to attend therapy "failed to protect them or even betrayed them."

¶ 26    The court additionally referenced Dr. Budd's concern that a child who has a history of extreme behaviors is more likely to repeat such behaviors under duress.  For this reason, Dr. Budd testified

that learning about C.B.'s history of suicidal ideation would have increased his trepidation about forcing C.B. into reintegration therapy with father.

¶ 27    Finally, the court noted that these concerns were somewhat echoed by Dr. Loizeaux, who testified that "[in] a case when you have kids going to the emergency room for suicidal ideation and fear of their father, you have to have a lot of checks and balances before you move ahead."

¶ 28    In light of the court's reference to this testimony, we can discern the court's concern that forcing C.B. to see father (in reintegration therapy or otherwise) would have endangered C.B.'s physical health and significantly impaired his emotional development by putting him at risk for "extreme behavior" — such as suicidal ideation — and estrangement from both parents. *See id.*

¶ 29    We are unconvinced by father's contention that the court couldn't rely on the above-described testimony because it was somewhat hypothetical. Dr. Budd's pertinent concerns arose in regard to the specific circumstances C.B. faced: being unwilling to contact father after a history of abuse and having been previously hospitalized for suicidal ideation. While none of the experts could

say that C.B. would *certainly* experience negative consequences if he were forced to see father, father doesn't cite, and we haven't found, any authority that prevents a court from relying on expert opinion about the general risks of a child under circumstances similar to those in the case before it.

¶ 30    Finally, to the extent father contends that the court erred by applying the incorrect legal standard at temporary orders hearings, we don't consider his argument because the temporary orders are not on appeal. *See In re Marriage of Brantley*, 674 P.2d 1388, 1389 (Colo. App. 1983) (noting that temporary parenting orders are not subject to appellate review); § 14-10-108(5)(a), C.R.S. 2024 (providing that temporary orders do not prejudice the parties' rights adjudicated at subsequent hearings).

¶ 31    For the foregoing reasons we conclude that the trial court applied the correct legal standard in restricting father's parenting time with respect to C.B.

### b.    F.B.

¶ 32    In contrast to the findings about C.B., we can't tell whether the trial court appropriately applied the endangerment standard to F.B.  While the court repeated that it was not granting father

12

parenting time with F.B. because of the "professionals' opinions and evidence of abuse and trauma," the testimony about the risks of forcing contact between father and the children pertained primarily to C.B., not F.B. The court also referenced testimony from professionals indicating that F.B. was willing to participate in reintegration therapy with father and had at least some positive experiences with it. At the same time, Dr. Budd expressed that he wasn't sure if either child's relationship with father could be repaired and unequivocally recommended that "[n]either [C.B.] nor [F.B.] should be compelled to spend time with their dad."

¶ 33    Due to the lack of findings specific to F.B. and the lack of reference to any testimony regarding ongoing risks to a child in F.B.'s circumstances, we are unable to determine whether the court appropriately applied the endangerment standard to F.B. when it completely eliminated father's parenting time, nor can we determine why the court concluded that the complete elimination of parenting time was in F.B.'s best interests. *See In re Marriage of Rozzi,* 190 P.3d 815, 822 (Colo. App. 2008) ("A trial court's order must contain findings of fact and conclusions of law sufficiently explicit to give an appellate court a clear understanding of the basis of its order and to

enable the appellate court to determine the grounds upon which it rendered its decision.").

¶ 34　Accordingly, we remand to the trial court for additional findings concerning F.B. *See* § 14-10-124(1.5)(a). On remand, the trial court must consider the parties' and F.B.'s circumstances at the time of the remand proceeding and permit the parties to present new evidence of such circumstances. *See In re Marriage of Schlundt*, 2021 COA 58, ¶ 56. The trial court must give priority to the remand proceeding under section 14-10-128(1), C.R.S. 2024, but we decline father's request to order the trial court to hold a hearing "as soon as possible."[2] The existing order shall remain in effect pending entry of a new order by the trial court. *See Schlundt*, ¶ 56.

¶ 35　Because of our disposition, we need not consider father's remaining contentions as they relate to F.B.'s parenting time.

---

[2] As best we can discern, Father relies on the remand instructions in *In re Marriage of Wollert*, 2020 CO 47, in making this request. *Wollert* concerned the remand for an emergency hearing under section 14-10-129(4), C.R.S. 2024, which, under the circumstances of that case, required the court to hold a hearing within fourteen days. *Wollert*, ¶ 41 n.8. Parenting time proceedings under section 14-10-124, C.R.S. 2024, have no similar time requirement.

## 2.  Less Detrimental Alternatives

¶ 36  Father's next contention is that the trial court erred by restricting father's parenting time with C.B. without first considering a less detrimental alternative.  Under the circumstances of this case, we perceive no reversible error.

¶ 37  The concept of the "least detrimental alternative" recognizes that some "detriment to a child is present in every [parenting time] decision, [and] a court's task is to make the [parenting time] choice 'least detrimental' to the child."  *In re Marriage of Martin*, 42 P.3d 75, 78 (Colo. App. 2002) (citation omitted).  The "least detrimental alternative" analysis is subsumed within the concept of the best interests of the child.  *Id.*  However, at least one division of this court has previously held that a court may not "completely deny [a parent] parenting time under the best interests standard without *express consideration* of whether doing so is the least detrimental alternative."  *Hatton*, 160 P.3d at 333 (emphasis added).

¶ 38  We acknowledge that the court's permanent orders did not include the phrase "least detrimental alternative."  But assuming, without deciding, that the court erred by not making express findings about whether providing C.B. with control over his

15

attendance at joint reintegration sessions was the least detrimental alternative, the error was harmless under the circumstances here. *Bly v. Story*, 241 P.3d 529, 535 (Colo. 2010) (holding that an error only affects a party's substantial rights if "it can be said with fair assurance that the error substantially influenced the outcome of the case or impaired the basic fairness of the trial itself" (quoting *Banek v. Thomas*, 733 P.2d 1171, 1178 (Colo. 1986))).

¶ 39　　Specifically, the court's order demonstrates that the court considered, and rejected, the only other alternative available: father's proposed parenting plan. The only substantive difference between father's proposed parenting plan for C.B. and the court's order was that, under father's plan, C.B. would be required to attend joint reintegration sessions with father and Dr. Bresnick after three months of individual therapy. The court noted father's proposed plan in its findings. However, as set forth above, it found — with ample record support — that forcing C.B. into contact with father would not be in C.B.'s best interests. Father doesn't explain, and we can't discern, what other alternatives the court should have considered. Under these circumstances, we don't perceive how the court's failure to expressly state that it considered

16

other alternatives and concluded that the plan it chose was the least detrimental "substantially influenced the outcome of the case." *Id.* Accordingly, the court didn't reversibly err.

### 3. Delegating Parenting Time Decisions

¶ 40 Father asserts that the trial court improperly delegated parenting time decisions to C.B. when it ordered that C.B. could not be required to attend joint reintegration therapy sessions with him. We disagree.

¶ 41 We agree with father that a court may not delegate its authority to decide whether parenting time should occur to any third party, including the child. *See In Interest of D.R.V-A.*, 976 P.2d 881, 884 (Colo. App. 1999). However, to the extent father relies on *D.R.V-A.* to suggest that reintegration therapy is always "parenting time" for purposes of domestic relations proceedings and, therefore, that a court may not grant a child autonomy over whether to participate in reintegration therapy, we disagree.

¶ 42 Father relies on the following language in *D.R.V-A.*: The "order, which effectively defers to the family therapist the trial court's decisions as to when mother should be allowed to participate in family therapy or exercise unsupervised parenting time, constitutes

17

an improper delegation of the court's authority." *Id.* at 885. While at first glance this language appears to support father's contention, the surrounding context reveals otherwise.

¶ 43     In *D.R.V-A.*, mother had supervised parenting time "until such time as the guardian [ad litem] and family therapist agreed that unsupervised visits should resume." *Id.* at 883. Mother's ability to obtain the family therapist's agreement to resume unsupervised parenting time was "affected by the lack of . . . family therapy." *Id.* The court ordered father to have the children participate in family therapy but also ordered that mother could only be involved in the therapy to the extent the therapist believed it appropriate. *Id.* Finally, the court ordered that it would reconsider the issue of unsupervised parenting time only when the family therapist filed a recommendation for the same. *Id.*

¶ 44     On appeal, mother contended that "the trial court erred in structuring the order in such a way that her *ability to exercise unsupervised parenting time* is dependent upon the family therapist filing such a recommendation with the court." *Id.* at 884 (emphasis added). A division of this court agreed, holding that the order

> constituted an improper delegation of
> authority because it precluded mother from
> obtaining an evidentiary hearing until such
> time as the family therapist recommended
> unsupervised [parenting time].  When and if
> that point was reached, presumably an
> evidentiary hearing would be unnecessary.
> Thus, we conclude that the decision to
> condition the exercise of parenting time on the
> assent of the family therapist was improper, as
> was the court's conditioning the setting of an
> evidentiary hearing on such assent.

*Id.*

¶ 45     Without further analysis about why the order was improper,

the division then used the language on which father relies as the

concluding paragraph in the relevant section of the opinion.  *Id.* at

885.

¶ 46     Viewed in context, particularly given the way mother framed

the issue on appeal, it's clear that the issue in *D.R.V-A.* was not

mother's participation in family therapy per se.  It was that

mother's ability to exercise unsupervised parenting time — or even

to obtain a hearing on that topic — was expressly conditioned on

the therapist's recommendation.  And in turn, that recommendation

was affected by the therapist's authority to determine whether

mother participated in family therapy.

¶ 47    We therefore don't perceive *D.R.V-A.* as holding that reintegration therapy is *always* "parenting time" such that a child can *never* be given autonomy over whether to participate in it.[3]  In this case, it's clear that the reintegration therapy is not parenting time.  Indeed, the court expressly stated that it "cannot, in good conscience, order *any* parenting time between Father and [C.B.]" because parenting time with father was not in C.B.'s best interests.  (Emphasis added.)  And — unlike in *D.R.V-A.* — father's ability to exercise parenting time in the future is not expressly conditioned on the therapist's recommendation.  Therefore, we do not perceive that the court improperly delegated any decision about whether parenting time between C.B. and father may take place.

---

[3] To the extent *In Interest of D.R.V-A.*, 976 P.2d 881 (Colo. App. 1999), does hold that reintegration therapy is always, as a matter of law, "parenting time" in domestic relations proceedings, we disagree.  *See Chavez v. Chavez*, 2020 COA 70, ¶ 13 ("[D]ivisions are not bound by the decisions of other divisions . . . .").  While reintegration therapy may be considered "parenting time" in some circumstances, the court's order makes clear that it isn't parenting time under the circumstances of this case.

### 4. Constitutional Rights

¶ 48 Father contends that the court failed to consider his constitutional right to parent and was required to find "compelling circumstances" before restricting his parenting time. We disagree.

¶ 49 Parents have fundamental constitutional rights to the care, custody, and control of their children. *Troxel v. Granville*, 530 U.S. 57, 65 (2000). However, such rights are not implicated when a court allocates parental responsibilities between two parents, both of whom have the same fundamental rights. *See Vanderborgh v. Krauth*, 2016 COA 27, ¶¶ 20-21; *In re Marriage of DePalma*, 176 P.3d 829, 832 (Colo. App. 2007); *cf. In re Marriage of McSoud*, 131 P.3d 1208, 1219 (Colo. App. 2006) (noting that by allocating sole religious decision-making responsibility to one parent, "the court expanded one parent's right to the care, custody, and control of a child at the expense of the other parent's similar right," which didn't implicate constitutional rights).

¶ 50 Father's reliance on *People v. Zoller*, 2023 COA 117, is misplaced. That case concerns conditions of supervised release in a criminal setting, not an allocation of parental responsibilities between two parents. *Id.* at ¶¶ 19-20.

## III.   Decision-Making

¶ 51   Father contends that the trial court erred by granting mother sole decision-making authority with respect to both children because the court (1) didn't make sufficient factual findings to support its conclusion that father committed child abuse and (2) failed to consider father's constitutional rights.

### A.   Applicable Law and Standard of Review

¶ 52   When allocating decision-making responsibility under section 14-10-124(1.5)(b), a court shall generally consider (1) credible evidence of the parties to cooperate and make decisions jointly; (2) whether the parties' past pattern of involvement with the child reflects a system of values and mutual support that would indicate the parties' ability to provide a positive relationship with the child as joint decision-makers; and (3) whether an allocation of joint decision-making responsibility would promote more frequent contact between the child and each of the parties.

¶ 53   In addition, where a claim of child abuse is made, the court shall consider "[w]hether one of the parties has committed an act of child abuse or neglect as defined in section 18-6-401, C.R.S. [2024], or as defined under the law of any state, which factor must be

22

supported by a preponderance of the evidence." § 14-10-124(4)(a)(I); *see also In re Marriage of McCaulley-Elfert*, 70 P.3d 590, 593 (Colo. App. 2003). Under section 18-6-401(1)(a),

> A person commits child abuse if such person causes an injury to a child's life or health, or permits a child to be unreasonably placed in a situation that poses a threat of injury to the child's life or health, or engages in a continued pattern of conduct that results in malnourishment, lack of proper medical care, cruel punishment, mistreatment, or an accumulation of injuries that ultimately results in the death of a child or serious bodily injury to a child.

The term "health" includes both physical and mental well-being. *People v. Sherrod*, 204 P.3d 472, 475 (Colo. App. 2007), *rev'd on other grounds*, 204 P.3d 466 (Colo. 2009).

¶ 54    If the court finds that child abuse occurred, "it shall not be in the best interests of the child to allocate mutual decision-making with respect to any issue over the objection of the other party . . . unless the court finds that there is credible evidence" that the parties can "make decisions cooperatively in the best interest of the child." § 14-10-124(4)(a)(II)(A).

¶ 55 Allocation of decision-making responsibilities falls within the sound discretion of the trial court. *In re Marriage of Morgan*, 2018 COA 116M, ¶ 23.

## B. Applicable Facts

¶ 56 Mother requested sole decision-making authority. Father requested that the court order joint decision-making authority.

¶ 57 The trial court found that father had committed child abuse by a preponderance of the evidence in three ways:

- Father "unreasonably placed [C.B.] in a situation that posed a threat of injury to [C.B.]'s life by stuffing candy wrappers into his mouth while holding him against a wall by his neck."

- Father "caused injury to [C.B.]'s and [F.B.']s mental health by grabbing them by the necks and arms" and verbally denigrating them.

- Father "engaged in a continued pattern of conduct that resulted in mistreatment" when he verbally denigrated C.B. and F.B.

¶ 58 Based on the child abuse finding, the trial court awarded sole-decision making authority to mother.

## C. Analysis

### 1. Child Abuse

¶ 59    Father contends that none of the ways in which the trial court found father committed child abuse meet the technical requirements of section 18-6-401(1)(a).

¶ 60    Father first argues that the court failed to articulate how the candy wrappers threatened C.B.'s life. On this record, we disagree that any further findings are necessary. Forcibly shoving candy wrappers into a child's mouth while holding the child against the wall by his neck[4] presents an obvious choking risk. While more might be required to convict someone beyond a reasonable doubt, this was sufficient for the court to find that the candy wrapper incident was an act of child abuse by a preponderance of the evidence. *Cf. McCaulley-Elfert*, 70 P.3d at 592-93 (holding that, when the court credited wife's testimony that her daughter had been sexually abused over husband's denial, that evidence was

---

[4] Father repeatedly asserts that the record supports, at most, that he grabbed C.B. by back of the neck rather than the front of the neck. This distinction doesn't affect our view of the court's child abuse finding in this case.

25

sufficient to support a finding of child abuse by a preponderance of the evidence).

¶ 61    Next, father asserts that the record does not support the trial court's findings of child abuse because the trial court did not find father acted with the appropriate mens rea. Assuming, without deciding, that the trial court had to make a mens rea finding, any error is harmless.

¶ 62    Child abuse may be committed knowingly, recklessly, or with criminal negligence. § 18-6-401(7). A person commits child abuse with criminal negligence when, "through a gross deviation from the standard of care that a reasonable person would exercise, he fails to perceive a substantial and unjustifiable risk," § 18-1-501(3), C.R.S. 2024, that, "in light of the child's circumstances, a particular act or omission will place [the] child in a situation which poses a threat of injury to the child's life or health," *People v. Deskins*, 927 P.2d 368, 371 (Colo. 1996) (describing reckless child abuse). In other words, criminally negligent child abuse occurs when the actor should have been aware (but was not) of the risk that his "conduct *could* result in an injury to a child's life or health." *Id.* at 373 (emphasis added) (describing risk of which perpetrator is required to be aware for

26

reckless child abuse); *see also Mata-Medina v. People,* 71 P.3d 973, 978 (Colo. 2003) ("[A]n actor is criminally negligent when he should have been aware of the risk but was not." (quoting *People v. Hall,* 999 P.2d 207, 219 (Colo. 2000))).

¶ 63    The record amply supports a conclusion that father acted with, at a minimum, criminal negligence.  He doesn't explain, and we can't discern, how the trial court could have found that it was reasonable for him to be unaware of the risk that stuffing candy wrappers in a child's mouth could result in an injury to the child's life or health.  Because we perceive no other way to view the record in this case, the court's error (if any) in not making a mens rea finding is harmless.  *See Bly,* 241 P.3d at 535 (holding that an error is harmless unless it can be shown with fair assurance that the error substantially impacted the outcome of the case).

¶ 64    Because we affirm the trial court's child abuse finding on these grounds, we need not consider father's contentions regarding the other acts of child abuse that the court found father committed.

## 2. Constitutional Considerations

¶ 65 Father claims the trial court erred by failing to consider his constitutional rights before allocating decision-making. We disagree for the same reasons set forth *supra* Part II.C.4.

## IV. Newly Discovered Evidence

¶ 66 After the permanent orders, father filed a C.R.C.P. 59 motion, asserting that there had been positive developments in his relationship with F.B. since the permanent orders hearing and citing recent status reports from Dr. Bresnick as newly discovered evidence. The court denied the motion, concluding that evidence that came into existence after the hearing wasn't "newly-discovered evidence" under C.R.C.P. 59(d)(4).

¶ 67 Father contends that the court erred by denying his motion on those grounds. However, because we have reversed the parenting time order as to F.B. and because the court must consider F.B.'s and the parties' circumstances at the time of remand, we need not consider this contention.[5]

---

[5] Father's C.R.C.P. 59 motion also alleged that there was newly discovered evidence as to C.B. Because father doesn't raise this issue on appeal, we don't consider it.

## V.     Disposition

¶ 68     We reverse the portion of the trial court's permanent orders regarding the allocation of father's parenting time with F.B. and remand for proceedings consistent with this opinion.

¶ 69     We affirm in all other respects.

JUDGE FREYRE and JUDGE GROVE concur.

23CA1879 Marriage of Battles 11-14-2024

COLORADO COURT OF APPEALS

---

Court of Appeals No. 23CA1879
Arapahoe County District Court No. 21DR31702
Honorable Cajardo Lindsey, Judge

---

In re the Marriage of

Meghann Mary Ward Battles, n/k/a Meghann Mary Ward McPherson,

Appellee,

and

Cort Owen Battles,

Appellant.

---

JUDGMENT AFFIRMED IN PART, REVERSED IN PART,
AND CASE REMANDED WITH DIRECTIONS

Division V
Opinion by JUDGE LUM
Freyre and Grove, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced November 14, 2024

---

Meghann Mary Ward McPherson, Pro Se

Caroline C. Cooley, Christopher J. Linas, Castle Rock, Colorado, for Appellant

¶ 1     In this dissolution of marriage proceeding, Cort Owen Battles (father) appeals the portion of the permanent orders that allocate parental responsibilities for the two minor children to Meghann Mary Ward McPherson, f/k/a Meghann Mary Ward Battles (mother).  Father also appeals the trial court's denial of his motion for a new trial.

¶ 2     We affirm in part, reverse in part, and remand for further proceedings.

## I.     Background

¶ 3     Mother and father are the parents of two minor children, C.B. and F.B., who were thirteen and eleven (respectively) at the time of permanent orders.  Because of allegations that father had verbally (and sometimes physically) abused the children, the children's therapist made a report to the Department of Human Services. Early in the case, the court ordered that father's parenting time be supervised by a reintegration therapist.  The court also appointed Dr. Edward Budd as the parental responsibilities evaluator (PRE).

¶ 4     During the pendency of the case, both children participated in individual therapy, along with sessions with the reintegration therapist.  F.B. participated in some sessions with the reintegration

1

therapist and father, while C.B. refused to have contact with father. After the permanent orders hearing, the court ordered that father would not have any parenting time with either child, and mother would have sole decision-making responsibility.

¶ 5     Father filed a C.R.C.P. 59 motion based on newly discovered evidence; namely, a status report from the reintegration therapist. The court denied father's motion.

¶ 6     Father now appeals.  He contends the trial court erred by restricting his parenting time, allocating sole decision-making authority to mother, and denying the motion for a new trial.

## II.     Parenting Time

¶ 7     Father contends that the trial court erred by (1) restricting his parenting time without applying the endangerment standard; (2) restricting his parenting time without considering less detrimental alternatives; (3) improperly delegating parenting time decisions to the children; and (4) failing to consider his constitutional rights.

### A.     Applicable Law and Standard of Review

¶ 8     In all cases, the trial court must determine the allocation of parenting time according to the child's best interests, "giving paramount consideration to the child's safety and the physical,

mental, and emotional conditions and needs of the child." § 14-10-124(1.5), C.R.S. 2024. In making the best interests determination, the court must consider the factors set forth in section 14-10-124(1.5)(a)(I)-(XI). *In re Marriage of Finer*, 920 P.2d 325, 327 (Colo. App. 1996).

¶ 9 However, for a court to "impos[e] . . . a parenting time restriction," the court must also find "that parenting time by the [restricted] party would endanger the child's physical health or significantly impair the child's emotional development" and "enumerate the specific factual findings supporting the restriction," including findings related to child abuse. § 14-10-124(1.5)(a). "[W]hat constitutes endangerment to a particular child's physical or emotional health is a highly individualized determination . . . ." *In re Marriage of Parr*, 240 P.3d 509, 512 (Colo. App. 2010).

¶ 10 The determination of parenting time falls within the broad discretion of the trial court, and we will exercise every presumption that supports upholding the court's decision. *In re Marriage of Hatton*, 160 P.3d 326, 330 (Colo. App. 2007). A court abuses its discretion if its decision is manifestly arbitrary, unreasonable, or

unfair, or if it misapplies the law. *In re Marriage of Badawiyeh*, 2023 COA 4, ¶ 9.

¶ 11     "It is the responsibility of the trial court as the trier of fact to determine the credibility of the witnesses and the sufficiency, probative effect, and weight of the evidence." *Hatton*, 160 P.3d at 330. We review de novo, however, whether the court applied the correct legal standards in determining parenting time. *In re Parental Responsibilities Concerning B.R.D.*, 2012 COA 63, ¶ 15.

## B.     Additional Facts

¶ 12     During the permanent orders hearing, the court heard testimony from mother; father; Dr. Budd; and Dr. Shelley Bresnick, the children's reintegration therapist. By agreement, the court also considered the deposition testimony of Dr. Andrew Loizeaux, an expert retained by father to review Dr. Budd's work. The court found all the professional witnesses credible and concluded that Dr. Budd was more credible than Dr. Loizeaux.

¶ 13     Regarding the children's progress in reintegration therapy during the pendency of the case, the court found that

- C.B. had adamantly refused any contact with father, including in a therapeutic setting;

- F.B. and father had attended reintegration therapy together and "interact in a positive and affectionate manner";

- during F.B.'s sessions with father, "[b]oth appear very happy to see one another"; and

- regarding F.B., father had taken Dr. Bresnick's feedback well and "demonstrated insight into his behaviors."

¶ 14 Mother requested that father have no parenting time with C.B. Father proposed that C.B. continue to work with his individual therapist and with the reintegration therapist on an individual basis. After three months, father proposed that he and C.B. have joint reunification sessions every other week. Father also urged the court to set periodic status conferences regarding C.B.'s parenting time.

¶ 15 Mother proposed that father and F.B. continue having joint reintegration therapy sessions and that the parties could reassess moving beyond reintegration therapy when and if Dr. Bresnick and F.B.'s therapist believed F.B. was ready. Father proposed a step-up plan in which he would receive supervised visits after a month of reintegration therapy, followed by unsupervised visits, which would gradually increase until the parties had equal parenting time.

¶ 16    In considering the children's best interest, the court made the following additional relevant findings[1]:

- On one occasion, father forcibly stuffed candy wrappers in C.B.'s mouth while holding him against the wall by his neck.

- The children described "verbal derogation by [father] on a more or less daily basis."

- Father "verbally belittled and physically intimidated the [children], on a frequent basis, over a period of years . . . . [Father's] behavior produced father-child relationships so troubling for the [children] that whether the damage can be repaired is unclear."

- Father had "grabb[ed] [the children] by the necks and arms and call[ed] them cocksuckers, pussies, bitches, fuck holes, ass holes, retarded fucks, and pieces of shit."

- Father committed child abuse.

---

[1] Some of the court's findings were adopted from Dr. Budd's PRE report, Dr. Bresnick's status reports, or from statements made by the parties.

6

- C.B. had been taken to the emergency room on two previous occasions with suicidal ideation.

- C.B. told Dr. Budd that he did not want to see father "ever again under any circumstances."

- F.B. told Dr. Budd that he wanted to see father "every two weeks and only in the presence of a supervisor."

- Both children would strongly prefer to live with mother.

- "Each party has psychological limitations that helped cause and perpetuate problems in the family. Each externalizes responsibility."

- "Neither party is especially supportive of the other's relationship with the children."

- Both parents can place the children's needs ahead of their own, though each parent had "blind spots."

¶ 17 Father did not testify about any of the incidents of verbal degradation of the children or the incident with the candy wrappers. However, he confirmed the candy wrapper incident to Dr. Budd. The court also took judicial notice of apology letters father wrote to the children in which father acknowledged that he "bullied" the children and that his words were "hurtful and abusive."

¶ 18    Ultimately, the court ordered that C.B. continue therapy with his individual therapist and with Dr. Bresnick. However, the court ordered that C.B. could not be required to participate in reintegration therapy with his father if he displayed resistance to doing so. The court further ordered that, based on the professionals' opinions and the abuse and trauma C.B. suffered, parenting time between father and C.B. would not be in C.B.'s best interests.

¶ 19    The court made nearly identical orders regarding F.B. The court noted that it seemed F.B. was ready to participate in reintegration therapy, but nevertheless, F.B. could not be forced into therapy if he displayed resistance.

## C. Analysis

### 1. Endangerment Standard

¶ 20    Father contends that the trial court failed to apply the endangerment standard when restricting his parenting time with the children. Father also asserts that the court's findings that father abused the children concerned only past acts of child abuse, and the court failed to consider whether parenting time with father would *presently* endanger the children or significantly impair their

emotional development. We disagree as to C.B. but conclude that more findings are necessary as to F.B.

### a. C.B.

¶ 21 We recognize that the court did not specifically find that parenting time with father "would endanger [C.B.]'s physical health or significantly impair [C.B.]'s emotional development." § 14-10-124(1.5)(a). We also recognize that, as father argues, father's past acts of child abuse do not automatically mean that parenting time with him would presently endanger C.B. *See In re Marriage of Bertsch*, 97 P.3d 219, 222 (Colo. App. 2004).

¶ 22 Nevertheless, we can infer from the trial court's findings and order that it considered and applied the endangerment standard and concluded that contact with father would significantly impair C.B.'s emotional development or endanger his physical health. *See In re Marriage of Garst*, 955 P.2d 1056, 1059 (Colo. App. 1998) (noting that, while the court could have made more specific findings, the findings made and reference to the parenting evaluation "demonstrate that the trial court considered" the appropriate best interests factors).

¶ 23     The court began by citing the correct statutory standard for endangerment, along with the statutory best interests factors. To the extent father contends that the court's slight paraphrasing of the statutory language indicates that the court didn't understand or apply the correct law, we disagree.

¶ 24     In allocating parenting time, the court said that it "cannot, in good conscience, order any parenting time between Father and [C.B.]" The court based its decision on "the credible opinions of Dr. Budd and Dr. Loizeaux" and "evidence of [C.B.]'s abuse and trauma."

¶ 25     Immediately before making this order, the court referenced Dr. Budd's testimony that forcing C.B. to see father was a "bad idea" because a child who is forced into reintegration therapy often goes "nuts." The court also discussed Dr. Budd's testimony that a child in that situation may become estranged from *both* parents because the child perceives that the parent who forced them to attend therapy "failed to protect them or even betrayed them."

¶ 26     The court additionally referenced Dr. Budd's concern that a child who has a history of extreme behaviors is more likely to repeat such behaviors under duress. For this reason, Dr. Budd testified

that learning about C.B.'s history of suicidal ideation would have increased his trepidation about forcing C.B. into reintegration therapy with father.

¶ 27    Finally, the court noted that these concerns were somewhat echoed by Dr. Loizeaux, who testified that "[in] a case when you have kids going to the emergency room for suicidal ideation and fear of their father, you have to have a lot of checks and balances before you move ahead."

¶ 28    In light of the court's reference to this testimony, we can discern the court's concern that forcing C.B. to see father (in reintegration therapy or otherwise) would have endangered C.B.'s physical health and significantly impaired his emotional development by putting him at risk for "extreme behavior" — such as suicidal ideation — and estrangement from both parents. *See id.*

¶ 29    We are unconvinced by father's contention that the court couldn't rely on the above-described testimony because it was somewhat hypothetical. Dr. Budd's pertinent concerns arose in regard to the specific circumstances C.B. faced: being unwilling to contact father after a history of abuse and having been previously hospitalized for suicidal ideation. While none of the experts could

say that C.B. would *certainly* experience negative consequences if he were forced to see father, father doesn't cite, and we haven't found, any authority that prevents a court from relying on expert opinion about the general risks of a child under circumstances similar to those in the case before it.

¶ 30   Finally, to the extent father contends that the court erred by applying the incorrect legal standard at temporary orders hearings, we don't consider his argument because the temporary orders are not on appeal. *See In re Marriage of Brantley*, 674 P.2d 1388, 1389 (Colo. App. 1983) (noting that temporary parenting orders are not subject to appellate review); § 14-10-108(5)(a), C.R.S. 2024 (providing that temporary orders do not prejudice the parties' rights adjudicated at subsequent hearings).

¶ 31   For the foregoing reasons we conclude that the trial court applied the correct legal standard in restricting father's parenting time with respect to C.B.

### b.   F.B.

¶ 32   In contrast to the findings about C.B., we can't tell whether the trial court appropriately applied the endangerment standard to F.B.  While the court repeated that it was not granting father

12

parenting time with F.B. because of the "professionals' opinions and evidence of abuse and trauma," the testimony about the risks of forcing contact between father and the children pertained primarily to C.B., not F.B. The court also referenced testimony from professionals indicating that F.B. was willing to participate in reintegration therapy with father and had at least some positive experiences with it. At the same time, Dr. Budd expressed that he wasn't sure if either child's relationship with father could be repaired and unequivocally recommended that "[n]either [C.B.] nor [F.B.] should be compelled to spend time with their dad."

¶ 33    Due to the lack of findings specific to F.B. and the lack of reference to any testimony regarding ongoing risks to a child in F.B.'s circumstances, we are unable to determine whether the court appropriately applied the endangerment standard to F.B. when it completely eliminated father's parenting time, nor can we determine why the court concluded that the complete elimination of parenting time was in F.B.'s best interests. *See In re Marriage of Rozzi*, 190 P.3d 815, 822 (Colo. App. 2008) ("A trial court's order must contain findings of fact and conclusions of law sufficiently explicit to give an appellate court a clear understanding of the basis of its order and to

13

enable the appellate court to determine the grounds upon which it rendered its decision.").

¶ 34　Accordingly, we remand to the trial court for additional findings concerning F.B.  *See* § 14-10-124(1.5)(a).  On remand, the trial court must consider the parties' and F.B.'s circumstances at the time of the remand proceeding and permit the parties to present new evidence of such circumstances.  *See In re Marriage of Schlundt*, 2021 COA 58, ¶ 56.  The trial court must give priority to the remand proceeding under section 14-10-128(1), C.R.S. 2024, but we decline father's request to order the trial court to hold a hearing "as soon as possible."[2]  The existing order shall remain in effect pending entry of a new order by the trial court.  *See Schlundt*, ¶ 56.

¶ 35　Because of our disposition, we need not consider father's remaining contentions as they relate to F.B.'s parenting time.

---

[2] As best we can discern, Father relies on the remand instructions in *In re Marriage of Wollert*, 2020 CO 47, in making this request. *Wollert* concerned the remand for an emergency hearing under section 14-10-129(4), C.R.S. 2024, which, under the circumstances of that case, required the court to hold a hearing within fourteen days.  *Wollert*, ¶ 41 n.8.  Parenting time proceedings under section 14-10-124, C.R.S. 2024, have no similar time requirement.

## 2. Less Detrimental Alternatives

¶ 36 Father's next contention is that the trial court erred by restricting father's parenting time with C.B. without first considering a less detrimental alternative. Under the circumstances of this case, we perceive no reversible error.

¶ 37 The concept of the "least detrimental alternative" recognizes that some "detriment to a child is present in every [parenting time] decision, [and] a court's task is to make the [parenting time] choice 'least detrimental' to the child." *In re Marriage of Martin*, 42 P.3d 75, 78 (Colo. App. 2002) (citation omitted). The "least detrimental alternative" analysis is subsumed within the concept of the best interests of the child. *Id.* However, at least one division of this court has previously held that a court may not "completely deny [a parent] parenting time under the best interests standard without *express consideration* of whether doing so is the least detrimental alternative." *Hatton*, 160 P.3d at 333 (emphasis added).

¶ 38 We acknowledge that the court's permanent orders did not include the phrase "least detrimental alternative." But assuming, without deciding, that the court erred by not making express findings about whether providing C.B. with control over his

15

attendance at joint reintegration sessions was the least detrimental alternative, the error was harmless under the circumstances here. *Bly v. Story*, 241 P.3d 529, 535 (Colo. 2010) (holding that an error only affects a party's substantial rights if "it can be said with fair assurance that the error substantially influenced the outcome of the case or impaired the basic fairness of the trial itself" (quoting *Banek v. Thomas*, 733 P.2d 1171, 1178 (Colo. 1986))).

¶ 39 Specifically, the court's order demonstrates that the court considered, and rejected, the only other alternative available: father's proposed parenting plan. The only substantive difference between father's proposed parenting plan for C.B. and the court's order was that, under father's plan, C.B. would be required to attend joint reintegration sessions with father and Dr. Bresnick after three months of individual therapy. The court noted father's proposed plan in its findings. However, as set forth above, it found — with ample record support — that forcing C.B. into contact with father would not be in C.B.'s best interests. Father doesn't explain, and we can't discern, what other alternatives the court should have considered. Under these circumstances, we don't perceive how the court's failure to expressly state that it considered

16

other alternatives and concluded that the plan it chose was the least detrimental "substantially influenced the outcome of the case." *Id.* Accordingly, the court didn't reversibly err.

### 3. Delegating Parenting Time Decisions

¶ 40 Father asserts that the trial court improperly delegated parenting time decisions to C.B. when it ordered that C.B. could not be required to attend joint reintegration therapy sessions with him.

¶ 41 A court may not delegate parenting time decisions to any third party, including the child. *See In Interest of D.R.V-A.*, 976 P.2d 881, 884 (Colo. App. 1999). However, while the court gave C.B. autonomy over his participation in reintegration therapy, the reintegration therapy isn't parenting time under these circumstances. Indeed, the court expressly said that father had no parenting time. Therefore, there is no parenting time to delegate, and we perceive no error.

### 4. Constitutional Rights

¶ 42 Father contends that the court failed to consider his constitutional right to parent and was required to find "compelling circumstances" before restricting his parenting time. We disagree.

¶ 43    Parents have fundamental constitutional rights to the care, custody, and control of their children. *Troxel v. Granville*, 530 U.S. 57, 65 (2000). However, such rights are not implicated when a court allocates parental responsibilities between two parents, both of whom have the same fundamental rights. *See Vanderborgh v. Krauth*, 2016 COA 27, ¶¶ 20-21; *In re Marriage of DePalma*, 176 P.3d 829, 832 (Colo. App. 2007); *cf. In re Marriage of McSoud*, 131 P.3d 1208, 1219 (Colo. App. 2006) (noting that by allocating sole religious decision-making responsibility to one parent, "the court expanded one parent's right to the care, custody, and control of a child at the expense of the other parent's similar right," which didn't implicate constitutional rights).

¶ 44    Father's reliance on *People v. Zoller*, 2023 COA 117, is misplaced. That case concerns conditions of supervised release in a criminal setting, not an allocation of parental responsibilities between two parents. *Id.* at ¶¶ 19-20.

### III.    Decision-Making

¶ 45    Father contends that the trial court erred by granting mother sole decision-making authority with respect to both children because the court (1) didn't make sufficient factual findings to

18

support its conclusion that father committed child abuse and (2) failed to consider father's constitutional rights.

A. Applicable Law and Standard of Review

¶ 46    When allocating decision-making responsibility under section 14-10-124(1.5)(b), a court shall generally consider (1) credible evidence of the parties to cooperate and make decisions jointly; (2) whether the parties' past pattern of involvement with the child reflects a system of values and mutual support that would indicate the parties' ability to provide a positive relationship with the child as joint decision-makers; and (3) whether an allocation of joint decision-making responsibility would promote more frequent contact between the child and each of the parties.

¶ 47    In addition, where a claim of child abuse is made, the court shall consider "[w]hether one of the parties has committed an act of child abuse or neglect as defined in section 18-6-401, C.R.S. [2024], or as defined under the law of any state, which factor must be supported by a preponderance of the evidence." § 14-10-124(4)(a)(I); *see also In re Marriage of McCaulley-Elfert*, 70 P.3d 590, 593 (Colo. App. 2003). Under section 18-6-401(1)(a),

A person commits child abuse if such person causes an injury to a child's life or health, or permits a child to be unreasonably placed in a situation that poses a threat of injury to the child's life or health, or engages in a continued pattern of conduct that results in malnourishment, lack of proper medical care, cruel punishment, mistreatment, or an accumulation of injuries that ultimately results in the death of a child or serious bodily injury to a child.

The term "health" includes both physical and mental well-being. *People v. Sherrod*, 204 P.3d 472, 475 (Colo. App. 2007), *rev'd on other grounds*, 204 P.3d 466 (Colo. 2009).

¶ 48      If the court finds that child abuse occurred, "it shall not be in the best interests of the child to allocate mutual decision-making with respect to any issue over the objection of the other party . . . unless the court finds that there is credible evidence" that the parties can "make decisions cooperatively in the best interest of the child." § 14-10-124(4)(a)(II)(A).

¶ 49      Allocation of decision-making responsibilities falls within the sound discretion of the trial court. *In re Marriage of Morgan*, 2018 COA 116M, ¶ 23.

## B. Applicable Facts

¶ 50 Mother requested sole decision-making authority. Father requested that the court order joint decision-making authority.

¶ 51 The trial court found that father had committed child abuse by a preponderance of the evidence in three ways:

- Father "unreasonably placed [C.B.] in a situation that posed a threat of injury to [C.B.]'s life by stuffing candy wrappers into his mouth while holding him against a wall by his neck."

- Father "caused injury to [C.B.]'s and [F.B.']s mental health by grabbing them by the necks and arms" and verbally denigrating them.

- Father "engaged in a continued pattern of conduct that resulted in mistreatment" when he verbally denigrated C.B. and F.B.

¶ 52 Based on the child abuse finding, the trial court awarded sole-decision making authority to mother.

## C.    Analysis

### 1.    Child Abuse

¶ 53    Father contends that none of the ways in which the trial court found father committed child abuse meet the technical requirements of section 18-6-401(1)(a).

¶ 54    Father first argues that the court failed to articulate how the candy wrappers threatened C.B.'s life.  On this record, we disagree that any further findings are necessary.  Forcibly shoving candy wrappers into a child's mouth while holding the child against the wall by his neck[3] presents an obvious choking risk.  While more might be required to convict someone beyond a reasonable doubt, this was sufficient for the court to find that the candy wrapper incident was an act of child abuse by a preponderance of the evidence.  *Cf. McCaulley-Elfert*, 70 P.3d at 592-93 (holding that, when the court credited wife's testimony that her daughter had been sexually abused over husband's denial, that evidence was

---

[3] Father repeatedly asserts that he grabbed C.B. by the back of the neck rather than the front of the neck.  This distinction doesn't affect our view of the court's child abuse finding in this case.

sufficient to support a finding of child abuse by a preponderance of the evidence).

¶ 55    Next, father asserts that the record does not support the trial court's findings of child abuse because the trial court did not find father acted with the appropriate mens rea. Assuming, without deciding, that the trial court had to make a mens rea finding, any error is harmless.

¶ 56    Child abuse may be committed knowingly, recklessly, or with criminal negligence. § 18-6-401(7). A person commits child abuse with criminal negligence when, "through a gross deviation from the standard of care that a reasonable person would exercise, he fails to perceive a substantial and unjustifiable risk," § 18-1-501(3), C.R.S. 2024, that, "in light of the child's circumstances, a particular act or omission will place [the] child in a situation which poses a threat of injury to the child's life or health," *People v. Deskins*, 927 P.2d 368, 371 (Colo. 1996) (describing reckless child abuse). In other words, criminally negligent child abuse occurs when the actor should have been aware (but was not) of the risk that his "conduct *could* result in an injury to a child's life or health." *Id.* at 373 (emphasis added) (describing risk of which perpetrator is required to be aware for

reckless child abuse); *see also Mata-Medina v. People*, 71 P.3d 973, 978 (Colo. 2003) ("[A]n actor is criminally negligent when he should have been aware of the risk but was not." (quoting *People v. Hall*, 999 P.2d 207, 219 (Colo. 2000))).

¶ 57 The record amply supports a conclusion that father acted with, at a minimum, criminal negligence. He doesn't explain, and we can't discern, how the trial court could have found that it was reasonable for him to be unaware of the risk that stuffing candy wrappers in a child's mouth could result in an injury to the child's life or health. Because we perceive no other way to view the record in this case, the court's error (if any) in not making a mens rea finding is harmless. *See Bly*, 241 P.3d at 535 (holding that an error is harmless unless it can be shown with fair assurance that the error substantially impacted the outcome of the case).

¶ 58 Because we affirm the trial court's child abuse finding on these grounds, we need not consider father's contentions regarding the other acts of child abuse that the court found father committed.

## 2. Constitutional Considerations

¶ 59 Father claims the trial court erred by failing to consider his constitutional rights before allocating decision-making. We disagree for the same reasons set forth *supra* Part II.C.4.

## IV. Newly Discovered Evidence

¶ 60 After the permanent orders, father filed a C.R.C.P. 59 motion, asserting that there had been positive developments in his relationship with F.B. since the permanent orders hearing and citing recent status reports from Dr. Bresnick as newly discovered evidence. The court denied the motion, concluding that evidence that came into existence after the hearing wasn't "newly-discovered evidence" under C.R.C.P. 59(d)(4).

¶ 61 Father contends that the court erred by denying his motion on those grounds. However, because we have reversed the parenting time order as to F.B. and because the court must consider F.B.'s and the parties' circumstances at the time of remand, we need not consider this contention.[4]

---

[4] Father's C.R.C.P. 59 motion also alleged that there was newly discovered evidence as to C.B. Because father doesn't raise this issue on appeal, we don't consider it.

## V. Disposition

¶ 62     We reverse the portion of the trial court's permanent orders regarding the allocation of father's parenting time with F.B. and remand for proceedings consistent with this opinion.

¶ 63     We affirm in all other respects.

JUDGE FREYRE and JUDGE GROVE concur.